**William C. HALE, Plaintiff-Appellant,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.**

No. 86–1435.

United States Court of Appeals, Sixth Circuit.

Submitted Feb. 13, 1987.

Decided Feb. 19, 1987.

---

Edward J. Clinton, Jr., Weisberg & Walkon, P.C., Southfield, Mich., for plaintiff-appellant.

Peter Caplan, Asst. U.S. Atty., Detroit, Mich., Blanca Bianchi de la Torre, Office of the General Counsel, Chicago, Ill., for defendant-appellee.

Before MERRITT and MILBURN, Circuit Judges; and PECK, Senior Circuit Judge.

PER CURIAM.

Plaintiff William C. Hale appeals the district court's grant of summary judgment in favor of the Secretary in this action seeking review of the final decision of the Secretary denying plaintiff's application for disability benefits under the Social Security Act. The only issue raised on appeal is whether substantial evidence exists in the record to support the Secretary's conclusion that plaintiff's back problems do not meet the Listing of Impairments at 20 C.F.R., Pt. 404, Subpt. P, App. 1, 1.05(C). For the reasons that follow, we affirm.

I

Plaintiff, born August 3, 1949, has a ninth-grade education. Plaintiff held various jobs as a security guard and as a machine operator until 1973, when he was employed by Ford Motor Company as a crankshaft "shake-out" man. This job required that plaintiff lift steel crankshafts weighing approximately seventy pounds. In the summer of 1975, while lifting a hoist, plaintiff sustained a twisting injury to his low back. As a result, plaintiff was admitted to the hospital for two weeks where he underwent physical therapy. Plaintiff's condition eventually improved, and he returned to work until February of 1976, when he reinjured his back while at work. On September 21, 1976, Dr. Jasper McLaurin diagnosed plaintiff as suffering from ruptured intervertebral disc, L4–L5 left. As a result of this back trauma, plaintiff began receiving social security benefits. Plaintiff remained unemployed until August 1982, when his social security benefits were terminated.

In September 1982, plaintiff went to work for Clif Patrol as a security guard. Plaintiff left this, his last gainful employment, on August 16, 1983, when he exacerbated his back injury.

Plaintiff was admitted to the Southwest Detroit Hospital on August 16, 1983, and discharged on August 30, 1983. The final diagnosis by attending physician Walter Everett was low back pain with bilateral sciatica. A ruptured lumbar disc was ruled out.

During plaintiff's hospitalization, his condition improved as a result of treatment with bed rest, medication, and pelvic traction. On admission plaintiff was suffering severe spasm; testing showed positive straight leg raising and lumbosacral lift. However, the spasm and lift had dissipated by the time of his discharge from the hospital. He was discharged with instructions to continue his activity restrictions, "to utilize the bed quite a bit, to utilize his oral medications and to see Dr. Little in the office in three weeks."

The next medical evidence of record is a report by Dr. Little, dated December 5, 1983. Dr. Little noted decreased range of motion in plaintiff's dorsolumbar spine and positive straight leg raising tests on the left side. However, Dr. Little indicated that these findings had been present since

1976, and X-rays were noted to be consistently normal.

On February 15, 1984, plaintiff was evaluated by physiatrist Dr. Alvin Brown. Dr. Brown noted that upon his discharge from Southwest Detroit Hospital, plaintiff underwent no further therapy and that he presently took no pain medication or muscle relaxants. Dr. Brown's physical examination revealed moderate tenderness over the left iliolumbar ligament, left paravertebral muscles, and at the lumbosacral junction. There was no associated palpable spasm. Dr. Brown detected no tenderness over the right iliolumbar ligament, right paravertebral muscles, sacroiliac joints, and sciatic notches. Range of motion was limited to seventy-five degrees of forward flexion with a pain response at that point and the appearance of palpable spasm on the left. Straight leg raising test was positive at seventy degrees on the left. Dr. Brown noted an impairment of superficial sensation in the L5–S1 distribution on the left, although deep sensation and vibratory sense were intact. There were no pathological reflexes. Dr. Brown observed that plaintiff had difficulty walking on his left toes but could walk on both heels.

Dr. Brown administered an electromyogram which revealed evidence of an S1 radiculopathy on the left. X-rays of the lumbosacral spine revealed degenerative disc disease at L5–S1 with considerable disc space narrowing. Dr. Brown concluded, "Based upon the history of an injury in 1975, and the degenerative changes noted on X-ray, I do not feel that this patient's condition is related to his 11 months of work as a security guard." Joint Appendix at 141.

Plaintiff was seen by Dr. McLaurin again on February 24, 1984. Dr. McLaurin noted that plaintiff was not on any medication nor was he receiving any medical treatment. On physical examination, Dr. McLaurin detected tenderness in the lumbosacral area but no muscle spasm. There was a decreased range of movement of the lumbosacral spine in flexion, extension, and lateral bending. Plaintiff had difficulty in heel and toe standing and deep knee bends,

favoring the left leg. Straight leg raising was positive at forty degrees on the left and sixty degrees on the right. Dr. McLaurin further detected a decreased sensation to light touch and pin prick over the left lower extremity corresponding to the distribution of L5–S1.

Dr. McLaurin's electromyographic studies showed no abnormalities. The diagnostic impression was (1) possible ruptured intervertebral disc, L4–L5 on the left, with sciatic radiculitis, and (2) varicosities of the left lower extremity. Dr. McLaurin noted that the electromyographic study on February 21, 1976, showed possible denervation at the level of L4–L5 on the left, but that this was not found on the present examination. Dr. McLaurin concluded, "It is my professional opinion that this man's present complaints were caused by the injury sustained in 1975 and that the injury in 1976 and again in 1983 were aggravations of a pre-existing condition. The overall prognosis is guarded." Joint Appendix at 115.

Plaintiff filed the present application for disability benefits on October 31, 1983. The application was denied initially and upon reconsideration, prompting plaintiff to request a de novo hearing before an Administrative Law Judge ("ALJ").

At the hearing, plaintiff testified that he can stand only twenty minutes before his legs start to shake. Plaintiff stated that he could presently sit for one-half to one hour with no discomfort. Three to four months earlier, plaintiff was unable to sit for even that period of time and "eighty-five percent of the time I mostly was laying down." Plaintiff testified that he suffers pain in the lower back on the left side and that sometimes he cannot get out of bed for one-half hour to forty-five minutes after awakening. Plaintiff stated that his condition was about the same as it was in 1976 and that he had not had a really serious problem until the previous Friday, when his back gave out while walking six blocks home from the supermarket. Plaintiff testified that his bouts of pain occur approximately two times per week for one to one and one-half hours. To relieve the pain, plaintiff usually takes Tylenol Extra

Strength. He occasionally takes Tylenol Number 4 and muscle relaxers.

At the hearing, testimony was also received from a medical adviser, Dr. Robert Sobel. In Dr. Sobel's opinion, there was no question but that plaintiff suffers from a nerve root compression syndrome involving the left sciatic nerve root. Dr. Sobel felt the problem in evaluating plaintiff's condition related to its severity. Dr. Sobel stated that judging from the medical record, there had been little change between 1976 and 1984 and that, if anything, plaintiff's condition had improved because the electromyogram that was positive in 1976 was normal in 1984. Dr. Sobel further stated that the fact that plaintiff had not found it necessary to have on-going medical care and the fact that the symptoms, in plaintiff's opinion, were not severe enough to justify consideration of surgery indicated that the severity of the symptomatology was tolerable to plaintiff.

Dr. Sobel did not believe that plaintiff's condition met or equaled Listing 1.05(C):

[T]he claimant does have a history of pain. He does have a history of limitation of motion. No spasm was noted in the lower back. He does have a report of a neurological deficit, but that was described most recently for February of '84, over a year ago, and it was also characterized at that time, both by an examining physician and a treating physician, as being quite similar to what existed some 8 years previous in 1976. This would tend to suggest that it is not an ongoing condition, but rather a static residual of a previous insult to the nerve.

.     .     .     .     .

It's the absence of any progressive neurological deficit. There is a deficit, but it's static. And if anything, the electromiograms [sic] suggested some improvement between '76 and '84.

Joint Appendix at 65–66.

On cross-examination, plaintiff's attorney asked Dr. Sobel to compare the results of Dr. Brown's positive electromyogram with the results of the normal electromyogram reported by Dr. McLaurin nine days later. Dr. Sobel stated that the reports of the findings by Dr. Brown were quite similar to those reported in 1976, as was the case with Dr. McLaurin's findings. Dr. Sobel could not account for the contradictory conclusions by the two doctors except to note that "the electromiographic [sic] study may vary from time to time both as to the actual findings and the observer's appreciation of those findings. The electromiogram [sic] carries about a 15 to 20% false positive, false negative value." Joint Appendix at 71. Dr. Sobel did state that Dr. Brown's report met Listing 1.05(C).

In his decision denying plaintiff's application, the ALJ found that the medical evidence established that although plaintiff has back pain with radiculopathy, his impairment does not meet or equal Listing 1.05(C). In reaching this conclusion, the ALJ relied on Dr. Sobel's testimony that there were no progressive neurological signs and no evidence of any ongoing medical care or serious consideration of surgery. The ALJ continued the sequential evaluation process, determining that although plaintiff is unable to perform his past relevant work, he has the residual functional capacity to perform the full range of sedentary work. Applying the grid, 20 C.F.R., Pt. 404, Subpt. P, App. 2, Rules 201.24 and 201.25, the ALJ concluded that plaintiff is not disabled. This became the final decision of the Secretary when the Appeals Council determined that there was no basis for granting plaintiff's request for review.

Plaintiff then filed the present action under 42 U.S.C. § 405(g) seeking judicial review of the Secretary's final decision. The case was referred to the magistrate who issued a Report and Recommendation proposing that the decision of the Secretary be reversed and the matter be remanded for an award of benefits. However, the district court rejected the magistrate's Report and Recommendation and concluded that the medical evidence and the testimony of the medical adviser supported the ALJ's decision that plaintiff retained the residual functional capacity to perform sedentary work. This appeal followed.

## II

The only issue raised by plaintiff is whether the Secretary erred in concluding that plaintiff's impairment does not meet the criteria set forth at 20 C.F.R., Pt. 404, Subpt. P, App. 1, Listing 1.05(C). In considering this issue, our inquiry is limited to a determination of whether substantial evidence exists in the record, taken as a whole, to support the Secretary's factual findings and to a review for any legal errors. *Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). The reviewing court "may not try the case *de novo,* nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

Section 1.05(C) provides:

1.05 *Disorders of the spine:*

.    .    .    .    .

C. Other vertebrogenic disorders (e.g., herniated nucleus pulposus, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; and

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

The crux of plaintiff's argument is that the Secretary applied an incorrect legal standard by relying on the medical adviser's opinion that because there was no progressive neurological signs and no evidence of ongoing medical care or serious consideration of surgery, plaintiff's impairment does not meet the requirements of Listing 1.05(C). Plaintiff concedes that the regula-

tions require evidence of progressive or ongoing neurological abnormalities. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B). However, plaintiff argues that the medical adviser incorrectly interpreted the term "progressive" to mean "worsening."

As the Secretary notes, "progressive" is, in fact, defined as "increasing in severity; worsening." *See* 3 J. Schmidt, *Attorney's Dictionary of Medicine* 277 (1986). Moreover, we agree with the Secretary that the medical adviser's use of the terms "ongoing or progressive" is consistent with the general premise of the Listing. Section 1.00(B), which covers Listing 1.05(C), notes that impairments caused by vertebrogenic disorders usually improve with time or respond to treatment. Thus,

Appropriate abnormal physical findings must be shown to persist on repeated examinations despite therapy for a reasonable presumption to be made that severe impairment will last for a continuous period of 12 months. This may occur in cases with unsuccessful prior surgical treatment.

.    .    .    .    .

... Since abnormal findings may be intermittent, their continuous presence over a period of time must be established by a record of ongoing treatment. Neurological abnormalities may not completely subside after surgical or nonsurgical treatment, or with the passage of time. Residual neurological abnormalities, which persist after it has been determined clinically or by direct surgical or other observation that the ongoing or progressive condition is no longer present, cannot be considered to satisfy the required findings in 1.05C.

In the present case, Dr. Sobel, the medical adviser, initially noted that between 1976 and 1982, while receiving social security benefits, plaintiff apparently underwent no medical treatment. During plaintiff's hospitalization in August 1983, no neurological deficit was noted. As to Dr. Little's finding of a neurological deficit in November 1983, Dr. Sobel observed that Dr. Little

commented that his findings at that time were the same as those in 1976. Dr. Sobel opined that "when findings are the same over a period of 6 or 7 years, one anticipates it's a residual rather than a new deficit."

Similarly, Dr. Sobel noted that Dr. McLaurin's report of a neurological deficit in February 1984 was very similar to Dr. Little's findings, as well as the deficit found in 1976. Moreover, Dr. Sobel stated that the normal electromyographic examination performed in February 1984 indicated there was no longer any deficit. In Dr. Sobel's opinion, this record suggested that plaintiff's condition was not ongoing, but rather was a static residual of a previous insult to the nerve.

Finally, Dr. Sobel addressed Dr. Brown's findings. Dr. Sobel found the conflicting electromyographic results reported by Dr. Brown and Dr. McLaurin in the span of nine days to be insignificant as the test is subject to a fifteen to twenty percent false-positive, false-negative value. Moreover, Dr. Brown's findings were similar to those reported in 1976.

In our view, Dr. Sobel's testimony, based on the evidence of record, represents substantial evidence to support the Secretary's decision. As Dr. Sobel testified, the evidence points to the conclusion that any neurological deficit present in 1984 is a residual of plaintiff's 1976 injury. As noted, such residual abnormalities, which persist after it has been determined that the ongoing condition is no longer present, cannot satisfy the requirements of Listing 1.05(C). Given that plaintiff's benefits were terminated in 1982, that he was able to work as a security guard in 1982–83 (a job which required substantial walking), and that plaintiff underwent no medical treatment from 1976 to 1982, it must be concluded that plaintiff's condition resulting from the 1976 trauma was no longer present by 1983. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1243 (11th Cir. 1983). Accordingly, the Secretary was justified in concluding that the residual neurological abnormalities reported by Drs. Little, McLaurin, and Brown do not provide a basis for an award of benefits pursuant to Listing 1.05(C). Moreover, plaintiff's failure to show persistent muscle spasms or that he was undergoing prescribed therapy further supports the Secretary's decision. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir.1984) (lack of evidence indicating the existence of all the requirements of Listing 1.05(C) provides substantial evidence to support the Secretary's finding that claimant did not meet the Listing).

### III

Having found substantial evidence to support the Secretary's factual findings and no errors of law, the decision of the district court granting summary judgment for the Secretary is AFFIRMED.