Lisa WILLS, Plaintiff,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.

No. M87–72 CA.

United States District Court, W.D. Michigan, N.D.

Dec. 14, 1987.

Kenneth Penokie, U.P. Legal Services, Inc., Escanaba, Mich., for plaintiff.

Michael Shiparski, Asst. U.S. Atty., Grand Rapids, Mich., for defendant.

## OPINION

HILLMAN, Chief Judge.

This is a Social Security action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to review a final decision of the Secretary of Health and Human Services denying plaintiff Lisa Wills' claim for supplemental security income benefits (SSI). The matter is now before the court upon cross motions for summary judgment. Judicial review is limited to determining whether the Secretary's decision is substantially supported by the factual record and based upon application of proper legal criteria. *Hale v. Secretary of Health and Human Services,* 816 F.2d 1078, 1082 (6th Cir.1987). Employing this standard, the court reverses and remands for an award of benefits as detailed below.

Lisa is a nineteen year old young woman who has suffered from ornithine transcarbamylase (OTC) deficiency since her infancy. This is a rare genetic enzyme deficit that renders the liver incapable of properly regulating blood ammonia levels. Ammonia is toxic to the brain. OTC deficiency and its resultant hyper-ammonemia is invariably fatal in male children, but can be controlled by restricted protein diet and medication in females. Lisa's ammonina has generally been maintained within normal limits by these measures. Unfortunately, some brain damage has occurred. As the Secretary concedes in his brief, this has caused mild retardation and central nervous system defect in Lisa, and has contributed to learning and behavioral difficulties. The issue in this case is whether these problems were sufficiently disabling to entitle Lisa to SSI before her eighteenth birthday.[1]

42 U.S.C. §§ 1381a, 1382, and 1382c(a)(3)(A) provide for payment of SSI to eligible children who suffer from medically determinable impairments "of comparable severity" to conditions that would prevent an adult from working. There is no dispute here about Lisa's eligibility, if she was indeed disabled. The Secretary has permissibly construed the "comparable severity" language of the statute in regulations that require a child's impairment to meet or equal the applicable criteria set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, to be considered disabling. *See* 20 C.F.R. § 416.924; *Hinckley v. Secretary of Health and Human Services,* 742 F.2d 19 (1st Cir.1984); *Powell ex rel. Powell v. Schweiker,* 688 F.2d 1357, *reh. denied* 694 F.2d 727 (11th Cir.1982). The administrative law judge (ALJ) determined that Lisa's mental impairment did not satisfy the Listings at any time before she turned eighteen, and consequently ruled that she was not disabled.

█ The ALJ's decision is based in part upon the doctrine of *res judicata.* Lisa

---

1. Lisa became eighteen during the administrative pendency of her SSI application. She was awarded benefits as an adult commencing on her birthday. That decision is not before the court.

originally filed for benefits through her mother on July 12, 1984. Her application was denied on September 18, 1984, and not pursued thereafter. The mother submitted the current claim on October 9, 1985, asserting Lisa's disability since about 1972. The ALJ limited his inquiry about Lisa's impairment at the hearing to events occurring in 1985 and 1986. His opinion, despite boilerplate about consideration of the entire record, discusses no evidence pertinent to the period before her first application was denied. He stated that "[s]he had filed a prior application but no new and material evidence has been submitted and therefore the question is what was her condition commencing October 9, 1985" (Tr. 12). In these circumstances, it is clear that the ALJ meant to treat the earlier determination of nondisability as final, and refused to reopen the first benefit claim. The court is therefore without jurisdiction to consider a disability onset date or any evidence adduced before September 19, 1984. *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Gibson v. Secretary of Health, Education and Welfare,* 678 F.2d 653 (6th Cir.1982).[2] However, in light of the court's opinion, plaintiff's counsel may wish to consider petitioning the Secretary to reopen the original application pursuant to 20 C.F.R. § 416.1487 *et seq.,* in order to obtain greater benefits based upon an earlier disability onset.

■ In regard to the period between September 19, 1984, and August 5, 1986, the court is convinced that a reasonable mind could not adequately conclude that Lisa's mental impairment failed to meet the Listings. *See, Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971). There is some disagreement between the parties about which Listing is applicable here. The court agrees with the position taken by the Secretary in his supplementary brief that it is most appropriate

to approach this case under Listing § 112.02. *See,* 20 C.F.R. § 416.925(b)(2). The court does not agree with the Secretary's contention that analysis pursuant to § 112.02 at this point would amount to an impermissible *de novo* review. The ALJ explicitly stated that the record did not substantiate an impairment that met or equaled *any* Listing (Tr. 12). The court therefore sees no reason why it should not take the ALJ at his word and assume that he considered the criteria set out in § 112.02. Even if he did not, the court is not foreclosed from conducting its own inquiry. *See, Land v. Secretary of Health and Human Services,* 814 F.2d 241, 244–45 (6th Cir.1986) (per curiam) (claimant did not assert entitlement under Listing § 1.05(B) before Secretary; court of appeals considered Listing criteria and concluded that disability requirements not met).

Listing § 112.02 reads as follows:

*Chronic brain syndrome.* With arrest of developmental progression for at least six months or loss of previously acquired abilities.

Neither party has cited cases involving this Listing, and the court has not located any on its own. The Secretary appears to argue that § 112.02 requires regression or complete stoppage of development for a child to be considered disabled. This position rests on a misunderstanding of the meaning of the word "arrest". To "arrest" developmental progression means to "check the course of; stop *or slow down*" that progression. *Random House College Dictionary* (rev. ed. 1980) (emphasis added). Hence the court concludes that a child can show disability under § 112.02 by establishing regression of development, or at least six months' stoppage or substantial slowing of progress, attributable to organic brain dysfunction. In the present case, the Secretary correctly points out that Lisa has not generally stopped progressing or lost

---

**2.** There is a "colorable constitutional claim" exception to the *res judicata* principles established by *Sanders* and subsequent cases. Here plaintiff has alleged that she was denied due process when the ALJ restricted cross-examination of the vocational expert (VE) who testified at her hearing. This contention raises no colorable

constitutional issue. As explained previously, decisions about child's disability are based solely upon the medical considerations of the Listings. The vocational factors testified to by the VE are immaterial, and thus complete prohibition of cross-examination could not have affected the claim for benefits as a child.

previously acquired abilities. However, her development between September 19, 1984 and August 6, 1986 (her eighteenth birthday) was sufficiently gradual and difficult to satisfy the Listing and render her disabled.

The record after September 19, 1984 consists largely of reports by Lisa's school psychologist and the testimony of Lisa and her mother at the ALJ hearing. The psychologist, Vernon C. Andrews, evaluated Lisa at the beginning and end of her freshman year in high school, when she was sixteen years old. On November 7, 1984 he conducted a battery of tests, which documented pronounced learning impairment. Full scale IQ was measured at 71, in the "borderline" range.[3] Academic skills were recorded at second to fourth grade levels, in the lowest 1–2% of ninth graders. There was suggestion of moderately abnormal anxiety, lack of confidence, impulsiveness and distractibility, as well as more serious memory difficulties. Mr. Andrews summarized his findings and conclusions as follows:

Lisa is functioning in the borderline range of intellectual development with strength primarily in her verbal reasoning, vocabulary, and knowing what to do in certain situations. She is also strong in terms of her ability to anticipate social consequences from observed behaviors. Her weaknesses tend to be in long-term memory of information acquired through everyday and school experience, as well as in arithmetic reasoning which also involves some memory of number facts. She has difficulty with visual memory as well as perceptual difficulty in which she must use her finger to keep her place when reading or copying novel symbols. Lisa distorted figures A, 6, 7, and 8 on the Bender–Gestalt Test and she also had poor integration of figures A and 4 and she rotated figures 4 and 7. These are significant indicators of possible central nervous system dysfunctioning. She earned a perceptual-motor age of five years, ten months, thus, with a chrono-

logical age of sixteen years, two months, she was delayed approximately ten years, four months in her perceptual-motor development.

Lisa can become an interesting child to work with especially when she feels confident about herself. Lisa seems to need reminding that she can do certain tasks that she might think at first glance that she could not. She needs to [be] reminded that she is a capable person and can do many things. Lisa also needs to be socially reinforced, encouraged, and praised when she is able to accomplish things.

(Tr. 184–88).

Lisa was retested on June 5, 1985. Full scale IQ had improved to 73, still in the "borderline" category. Reading achievement remained static, while spelling and arithmetical abilities improved from first to second and second to third percentiles, respectively. Perceptual-motor age *decreased* to five years, three months. Memory deficiencies and affective problems persisted. Lisa demonstrated poor integrative capacity and planning ability, and her test taking and school work were marked by impulsiveness and lack of inner control. Mr. Andrews concluded that

This student is functioning in the borderline range of intellectual development with strengths primarily in her visual social understanding, but she is weak in her visual abstract reasoning, arithmetic reasoning, speed of copying, and vocabulary. Lisa had more difficulty sounding out words than comprehending what she reads. She tends to rush through her reading, omitting words and inserting others. Although her comprehension errors involved difficulty retaining information and making inferences, she was able to get the main idea from what she read. However, in school she is required to remember specific details for tests, which must be quite frustrating for her. Lisa can spell approximately five letter words of one syllable such as shout.

---

**3.** An IQ of 69 is considered *per se* disabling if it is accompanied by another significant impairment. Listing § 112.05(C).

Lisa can add with carrying, but she has difficulty subtracting with borrowing. She can multiply a three digit number by one digit and use a decimal. She could not calculate any other problems that were set up for her. It is evident that Lisa has more difficulty setting the problems up for herself to solve than when they are already set up on paper. Lisa counts on her fingers as a means of calculating her number facts.

Lisa has a rather poor self-image which effects (sic) her tendency to be resistive to cover up for not knowing answers and giving up easily rather than persevering to find solutions to problems. This effects (sic) all other areas of her schooling and perhaps her interpersonal relationships, as well.

(Tr. 192–94).

Despite ongoing difficulties, Mr. Andrews thought that Lisa made some progress in both her special education classes and her regular home economics class during 1984–85. At the beginning of the 1985–86 school year he explained that indications of possible central nervous system dysfunctioning would account for her low scores, and he joined her teachers and assistant principal in recommending that she continue in educable mentally impaired (EMI) classes (Tr. 195–97).

The ALJ gave full credit to the testimony of Lisa and her mother at the administrative hearing (Tr. 13). His summary of this evidence is reasonably thorough and accurate:

The claimant's mother, Barbara Wills, testified that the claimant has a bad liver and as a result her liver does not break down protein. Excess protein causes a toxin which damages her body and brain and her auditory and visual memory perception are diminished. The claimant has difficulty remembering things or learning things and despite being in the tenth grade in special education, her reading ability is at the fourth grade level and her mathematical ability is at the third grade level. She is behind in all of her subjects but can count money but could not obtain change for a $100 bill.

She cannot read a newspaper or telephone directory and cannot read a recipe. She becomes frustrated when she tries to read a recipe from a cook book and throws the book down.

On one occasion in June 1986, she required treatment in the hospital Emergency Room because her ammonia level was elevated (claimant conceded this was her fault.) The claimant does not like taking Sodium Benzoate because it makes her sick and her ornithene transcarbamoylase (sic) deficiency is controlled by diet. She is on a high carbohydrate low protein diet and cannot eat more than 30 grams of protein a day. Presently the claimant is living with her boyfriend and her boyfriend's parents. She has difficulty handling money and often times when asked to buy clothing or a particular item will spend money on records and tapes. Her mother has to go with her when she buys clothes or otherwise she would not do so. On an occasion she went to the fair and stayed away from home for 4 to 5 nights and her mother had to go after her. At times when she wants something, she throws a temper tantrum. Whenever her ammonia becomes excessive, she has behavioral problems.

The claimant testified that toward the end of June 1986, she experienced a sharp pain in her stomach and felt feverish and dizzy. She went to the Emergency Room at the hospital and was advised to remain on her diet and have her ammonia level checked. She eats three meals a day, mostly vegetables and seldom if ever eats steaks, hamburgers, or hot dogs but does enjoy fish and sea food. She testified that she has been trying to stick to her diet but did eat too many shrimp and that was why she had to go to the hospital.

(Tr. 10–11).

The record outlined above portrays a young woman whose developmental progression was significantly hindered by her chronic illness between mid–1984 and mid–1986. During this period she continued EMI instruction and performance in the

"borderline" range of intellectual functioning. Slow progress was made in practical abilities, spelling, and arithmetic, but she remained unable to perform simple subtraction. Reading did not improve, and by her eighteenth birthday Lisa still could not decipher a newspaper, telephone directory, or recipe. She continued to exhibit the perceptual-motor skills of a five year old. Severe problems with memory and abstract reasoning persisted; she remained incapable of constructing a mathematical problem or remembering details from her rudimentary reading, and she needed to use her fingers to recall visual and number facts. Affective and behavioral difficulties checked Lisa's progress at home and school; her distractibility and impulsiveness affected her school work, contributed to occasional tantrums and inappropriate spending, and in one instance landed her in the hospital when she deviated from her diet. There is no evidence that these problems were due to character flaws, lack of effort, or environmental disadvantages. Rather, they were caused, in the school authorities' phrase, by central nervous system dysfunctioning, or in the mother's words, by "a toxin which damages her body and brain." The court believes that Lisa's developmental progression was sufficiently arrested to warrant the conclusion that she was disabled.

The Secretary points out that two doctors hired by the state disability determination service rendered generalized opinions that Lisa's impairment did not meet or equal the Listings (Tr. 90, 132, 199, 204). These opinions mention nothing more than IQ scores, and contain no discussion of the developmental progression made material by Listing § 112.02. They are therefore totally conclusory in relation to the issue of Lisa's mental development outside the IQ area. Conclusory medical opinions are discountable by the ALJ. *See, e.g., Landsaw v. Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir.1986); *Murphy v. Secretary of Health and Human Services*, 801 F.2d 182, 185 (6th Cir. 1986). It is apparent here that the ALJ gave these opinions no weight whatsoever, as he failed even to mention them in his opinion. It is not for the court to weigh this evidence differently than the ALJ. *O'Banner v. Secretary of Health, Education and Welfare*, 587 F.2d 321, 323 (6th Cir.1978); *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir.1970), *cert. denied*, 402 U.S. 986, 91 S.Ct. 1685, 29 L.Ed.2d 152 (1971).

The Secretary also argues that Lisa could not be considered disabled during the time in question in light of her "relatively normal activities." The court agrees that in some respects Lisa could have been characterized as a fairly typical teenager. She got along well in school, liked her teachers, participated in gym and home economics. She remembered to do her chores at home and to comply with her diet, at least most of the time. She liked to cook, and hoped to find a job in child care if she could assimilate sufficient training. She had a boyfriend, and some psychological data indicates that she was sensitive to social relationship and nuance. None of this alters the fact that her chronic brain syndrome drastically retarded the development of her intellect, practical and academic knowledge, perceptual-motor, memory, and abstraction skills, concentration, and emotional self-control. Moreover, the court rejects the implication that mentally disabled people must by definition forego many of the "normal activities" others take for granted: education, exercise, productive contribution, insight, friendship, love, ambition.

There is an old adage that sympathetic plaintiffs make bad law. That is why the court rests its holding on the express language of Listing § 112.02. Nevertheless, it may be well to add in closing that Lisa would appear from a practical standpoint to have been exactly the sort of child the SSI program was intended to benefit. She suffered (and still suffers) from a serious genetic disorder that arrested (and still arrests) her mental development. She spent her school years in special education classes, and was adjudged incapable of adult work upon her eighteenth birthday. Any reasonable nonbureaucratic person would have regarded her as disabled. The record as a whole in this case supports no other conclusion. *See, e.g., Evans v. Secre-*

*tary of Health and Human Services,* 820 F.2d 161, 164 (6th Cir.1987); *Allen v. Califano,* 613 F.2d 139, 145 (6th Cir.1980).

In light of the foregoing, plaintiff's motion for summary judgment is granted. Defendant's motion is denied, and this case is remanded for payment of child's SSI benefits based upon a disability onset of September 19, 1984. Disposition is without prejudice to plaintiff's option of petitioning the Secretary to reopen her original claim of an earlier disability date.